Filed 12/1/21  P. v. Rickard CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CHARLES KEVIN RICKARD, <br><br> Defendant and Appellant. | D078530 <br><br><br> (Super. Ct. No. CR126548) |

APPEAL from an order of the Superior Court of San Diego County, Joan P. Weber, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Lynne G. McGinnis, and Christine L. Berman, Deputy Attorneys General, for Plaintiff and Respondent.

In 1992, a jury convicted Charles Kevin Rickard of second degree murder (Pen. Code,[1] § 187, subd. (a)). The court sentenced Rickard to an indeterminate sentence of 15 years to life. Rickard appealed, and we affirmed the judgment in an unpublished opinion filed November 23, 1993. (*People v. Rickard* (Nov. 23, 1993, D017250) [nonpub. opn.].)

In January 2019, Rickard filed a petition for resentencing under section 1170.95. The court appointed counsel, received briefing, and issued an order to show cause (OSC). Thereafter, the court held a contested evidentiary hearing. At the conclusion of that hearing, the court denied the petition for resentencing, finding the People proved beyond a reasonable doubt that Rickard was a direct aider and abettor. There is sufficient evidence to support the trial court's decision. Accordingly, we will affirm the trial court's order denying the petition.

BACKGROUND AND PROCEDURAL FACTS

We take the following facts from our prior, unpublished opinion *People v. Rickard*, *supra*, D017250.[2]

"On August 11, 1991, Rickard and others lived under and near highway bridges in the riverbed of the San Diego River in Mission Valley in the area of Pacific Coast Highway and Interstate 5 freeway. Rickard lived with his girlfriend, Stacy Meachem, and both of them used methamphetamine regularly, including the morning of August 11. Meachem told Rickard that Amanda O[.] had come to their camp the day before and had argued over a $5 debt, with the two of them trading insults. Meachem related that [Amanda] choked her and rubbed a knife against her leg. Moreover, [Amanda] caused

---

[1] Further unspecified statutory references are to the Penal Code.

[2] We granted Rickard's request to take judicial notice of the files in case No. D017250.

2

Meachem to redeem her collection of cans worth $3, giving the proceeds to [Amanda], to return some borrowed pants and to hand [Amanda] her mostly full pack of cigarettes. Meachem told Rickard that [Amanda] had 'raped' her.

"On hearing what Meachem told him, Rickard became angry and he announced they had to go over to [Amanda]'s camp, grabbing Meachem's arm and leading her there. [Amanda] was not in her camp at the time and Rickard began hitting Meachem telling her she was a 'puss' who could not stand up to [Amanda]. James Risner, Rickard's best friend, showed up and walked off with Rickard.

"Meachem next saw Rickard and Risner talking to [Amanda] at her camp. [Amanda] was on the ground with Rickard standing over her, 'pulling up her wrists,' and grabbing her by the hair. Rickard hit [Amanda] on the top of the head with the butt of a knife and told Meachem to leave. Meachem went to the camp of Terry Hansen.

"Some time later Rickard showed up at Hansen's camp and said he and Risner had killed [Amanda]. Rickard had changed his pants because they were dirty, he said, and thrown them away. Before [Amanda]'s body was found, Rickard asked Hansen if he could borrow a shovel to go fishing. Hansen did not have a shovel to lend, and thought Rickard's request to borrow a shovel for fishing was strange since it was almost dark at the time. The exact location of the stabbing was never identified.

"On the night of August 11, 1991, Rickard said to a friend, George Mooney, 'Wow, what a rush when you stab someone.' Another resident of the riverbed, David Michael McBride, saw Risner on the next night and noticed he had some long scratches on his face and cheeks. Also, riverbed resident, Marvin Wayne Abramson, saw Rickard and Risner arguing and noticed Risner had scratches on his face.

3

"Late in the evening of August 11, 1991, Risner told Abramson that he and Rickard had killed [Amanda]; Rickard had handed Risner his knife and held [Amanda] down while Risner stabber her, then put her in the river. Risner also told Abramson that an hour after he put [Amanda] in the river, he returned and saw that [Amanda] had dragged herself up out of the river and was sitting up looking at him, at which point Risner picked up a rock and bashed her in the head then kicked or threw her back into the river. The next morning, August 12, Abramson went to the river and saw [Amanda]'s body in the water.

"On August 13, 1991, the other riverbed residents discovered [Amanda]'s body in the river and notified police. [Amanda] had suffered multiple stab wounds to her upper body and head, and blunt force trauma to her head. Seven of the stab wounds were in [Amanda]'s back and seven were in her front. Potentially fatal were four stab wounds, one that penetrated the inner layers of her abdomen four and one-half inches deep and one which injured her liver four and one-half inches deep. Four stab wounds lacerated the carotid artery and jugular vein on both sides of her neck and would have caused death in minutes. Each one of the wounds to the lung, liver and neck, by itself would have caused death. So also would the two blows to the top of [Amanda]'s head have caused death. There were bruises on the back of [Amanda]'s hands and she had no defensive, i.e., incised or cut, wounds on her hands. [Amanda] was alive when the stab wounds and the blunt trauma to her head were inflicted.

"[Amanda]'s wounds were consistent with a prosecution theory that Rickard held [Amanda] down while Risner stabbed her using a knife with which Rickard had just threatened [Amanda] to obtain an apology for the incident involving Meachem and to take back the cigarettes. Rickard

4

admitted that he handed the knife to the only other person at the scene, though he would not name that person, Risner."

Following trial, a jury found Rickard guilty of second degree murder (§ 187 subd. (a)) and possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a).) The court sentenced him to prison for 15 years to life for murder, with a consecutive three-year term for the drug crime. Rickard appealed, and we affirmed the conviction in November 1993.

On January 9, 2019, Rickard filed a petition for resentencing pursuant to section 1170.95. The trial court issued an OSC, and following briefing, it held an evidentiary hearing January 29, 2021.

At the evidentiary hearing, the People sought to introduce two pieces of additional evidence, confidential risk assessment reports for Risner in 2015 and 2016. The court denied this request.

When the court asked the People whether a witness saw Rickard stab the victim, the People directed the court to Rickard's admission to Meacham and his statement to Mooney that it was a rush to stab someone. The People also told the court that a statement was made to Abramson that Rickard held down Amanda while he stabbed her, a statement that was admitted at trial.

When the court told defense counsel it seemed the only reasonable examination of the trial record led to the conclusion that Rickard brought the knife to the scene, hit the victim with the butt of the knife, and then supplied the knife to Risner, defense counsel said she was not confident about where the knife came from and commented, "I think that Mr. Rickard has a different take on that."

The court also asked defense counsel about "that other critical piece of evidence . . . which is your client holding [the] victim down while Risner is stabbing her 14 times, all over her head, her torso—" Defense counsel

5

responded that "Rickard was not present in his mind at the stabbing," said Rickard "would take issue with the statements that were made by some of the individuals and subsequently repeated to the Court," and challenged witnesses' credibility, noting some had addiction issues or cognitive challenges. She told the court Rickard "would deny . . . that was an accurate or a truthful statement."

The court concluded the jury could not have found beyond a reasonable doubt that Rickard was the direct killer based on the evidence in the record. But after considering whether the prosecution could "establish beyond a reasonable doubt that petitioner is guilty of second degree murder under the current interpretation of the law[,]" it concluded there was proof beyond a reasonable doubt that Rickard was a direct aider and abettor.

The court explained: "Mr. Rickard was the person with the direct motive. His girlfriend had been in this argument; she had claimed that victim had quote/unquote raped her; he was furious; he brought her to victim's campsite; he came armed with that knife; he brings his best friend. The evidence is pretty clear that Risner is a very close friend of his, who he knew to be violent. And Mr. Rickard holds the victim by her hair, with the knife, strikes her with the butt of the knife in her head, and then he tells his girlfriend, Ms. Meachem, 'Leave.' Clear implication: We're going to do some damage here. But, of course, Mr. Risner stays."

The court continued: "And we have eyewitnesses saying that defendant, petitioner, holds her down while she is being viciously stabbed in these 14 stab wounds. The medical examiner said multiple of these stab wounds would have been fatal and would—are the cause of death. And then we have the clear statement after the fact where he's talking to Ms. Meachem

6

in the interview room, and he tells her, 'I did it for you, honey.  Why didn't you say you didn't know nothing?' "

There were two theories for direct aiding and abetting at trial: bringing the weapon and holding down the victim.  The trial court noted the jury was instructed it had to unanimously agree as to *which* event occurred, and there is no doubt that the jury found that at least one of those two *acts* occurred.  Then the court said:  "reading over the entire record, I believe it's pretty clear that both of those acts were proved beyond reasonable doubt, making him a direct aider and abettor to the murder, with an obvious intent to kill.  [¶]  You don't bring a knife and you don't hold a victim down while she's being stabbed in the most vulnerable parts of her body. . . .  That is a specific intent to kill, in my mind."

The defendant told the court there were no eyewitnesses who saw him hold the victim down.[3]

Rickard timely appealed the court's determination that he is ineligible for resentencing under section 1170.95.

## DISCUSSION

There is only one issue before us in this appeal:  Is there sufficient evidence in the record to support the finding that Rickard was a direct aider

---

[3]  After the court ruled, Rickard, who was not under oath, told it, "No one saw me hold anybody down, and I took Ms. Meachem away.  I took her away from Mr. Risner, because Mr. Risner was a violent person, and it's like a weasel in a henhouse; when they start killing something, they don't—they don't stop.  But when Risner started attacking [Amanda], I took Meachem— Ms. Meachem away to a safe place, and then I came back."

and abettor?[4]  As we will explain, there is substantial evidence to support the finding and thus the denial of the petition.

## A. *Legal Principles*

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) was enacted to " 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723.)  Senate Bill 1437 did this by amending section 188, which defines malice, and section 189, which defines the degrees of murder.  (Stats. 2018, ch. 1015, §§ 2 & 3.)  Amended section 188 states: "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)  Amended section 189 states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶]  (1) The person was the actual killer.  [¶]  (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.  [¶] [or] (3) The

---

[4]  Rickard argues there are three possible standards of review for a trial court to use in assessing eligibility for resentencing under section 1170.95.  We need not consider which standard of review is the proper one for the evidentiary hearing, an issue currently before the Supreme Court (*People v. Duke* (2020) 55 Cal.App.5th 113, review granted Jan. 13, 2021, S265309), because here the court applied the independent factfinder standard, as the defendant requested.

8

person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e).)

Although the bill amended the felony murder rule to ensure that murder liability would be imposed only on perpetrators with malice aforethought, it did not change the definition of malice. (*People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*).) Express malice exists "when there is a manifest intent to kill." (*Ibid.*, citing § 188, subds. (a)(1) and (a)(2).) It is shown when the defendant either desires the victim's death or knows to a substantial certainty that death will occur. (§ 188, subd. (a)(1); *People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Implied malice exists if "someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart.' " (*Gentile*, at p. 844, citing § 188, subd. (a)(2).) Implied malice requires a defendant to engage in conduct he or she knows endangers the life of another, with a conscious disregard for life. (*People v. Chun* (2009) 45 Cal.4th 1172, 1191.)

"[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Gentile, supra*, 10 Cal.5th at p. 843, quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Under an implied malice aiding and abetting theory, there must be substantial evidence that the defendant intentionally committed, encouraged, or facilitated life-endangering conduct with a conscious disregard for life. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1058, review granted Sept. 23, 2020, S263939.)

Senate Bill 1437 also established resentencing relief for eligible defendants in section 1170.95. Under subdivision (a), "[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition" with the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts "when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019" under Senate Bill 1437.

If a petitioner is not ineligible as a matter of law, the court issues an OSC, and the trial court holds an evidentiary hearing. (§ 1170.95, subd. (d).) At this stage of the process, parties may rely on the record of conviction and/or present new evidence to demonstrate whether a defendant is eligible for resentencing. (§ 1170.95, subd. (d)(3).) The prosecution bears the burden of proving beyond reasonable doubt that the defendant is ineligible for resentencing. (*Ibid*.)

### B. *Standard of Review*

The question of whether a defendant committed a murder under a still-valid theory is a factual question. (*People v. Clements* (2021) 60 Cal.App.5th 597, 615, review granted Apr. 28, 2021, S267624.) We review a trial judge's fact finding for substantial evidence. (*Id.* at p. 618; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320; see *People v. Lopez* (2020) 56 Cal.App.5th

10

936, 953–954, review granted Feb. 10, 2021, S265974 [even if the independent factfinder standard applies at the evidentiary hearing, the standard of review on appeal is substantial evidence].) We analyze the record in the light most favorable to the trial court's finding and determine if there is sufficient substantial evidence to find the defendant guilty beyond a reasonable doubt. (*Clements*, at p. 618; *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087.)

## C. *Analysis*

Here, the court independently concluded the People had established Rickard's guilt beyond a reasonable doubt based on direct aiding and abetting principles. (See *Gentile*, *supra*, 10 Cal.5th at p. 855 ["section 1170.95 requires the superior court to determine on an individualized basis, after considering any new or additional evidence offered by the parties, whether the defendant is entitled to relief"].) There is substantial evidence in the record to support this finding.

There was evidence placing Rickard with Risner and Amanda: Meachem observed Rickard and Risner talking with Amanda at her camp, pulling Amanda's wrists, and grabbing her by the hair. Meachem saw Rickard hit Amanda with the butt of his knife. There was also evidence of Rickard's incriminating statements: After sending Meachem away to leave him with Risner and Amanda, Rickard later showed up and said he and Risner had killed Amanda. Rickard also told his friend Mooney near the time of Amanda's death, "What a rush when you stab someone." And during a break in a police interview, Rickard told Meachem he "did that" for her and wanted to know why she did not tell police she knew nothing. Risner's statements to Abramson likewise placed Rickard at the scene of the crime, holding down Amanda during the stabbing. Not only does this evidence

11

demonstrate Rickard's direct and active involvement in Amanda's death, but it also shows he aided Risner by providing the knife, a weapon Rickard admitted he provided. And he did so with the knowledge that his friend Risner was violent.

Further, while motive is not necessary for a murder conviction, it is often probative of intent to kill, which can be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 740–741.) Both the People and defense counsel here agreed Risner did not have a motive to kill. In contrast, Rickard had motive: his girlfriend's confrontation with Amanda. The trial court found this argument persuasive, noting Rickard's anger was what prompted him to confront Amanda. And Rickard's decision to send Meachem away while he and Risner stayed behind with Amanda was evidence they were "going to do some damage."

Rickard recognizes in his appellate briefs that there were two direct aiding and abetting theories: (1) he participated in the stabbing; and (2) he supplied the murder weapon to Risner. He acknowledges the court found there was evidence beyond a reasonable doubt that each of these factual scenarios was true. But he nonetheless contends that the court's misstatement that "we have eyewitnesses" means there was not sufficient evidence to find he held down Amanda during the stabbing. He further argues that absent this specific factual finding, it is reasonably probable the court would have found the prosecution had failed to carry its burden.

The court's reference to an eyewitness was not an accurate statement of the evidence; however, the court's factual conclusion that the defendant held down Amanda while she was being stabbed is nonetheless supported by substantial evidence and consistent with the evidence the trial court cited at the hearing. Meachem testified that Rickard told her he and Risner had

12

killed Amanda.  Mooney testified that Rickard told him it was a rush to stab someone around the time Amanda was killed.  And Abramson testified that Risner said Rickard held down Amanda while Risner stabbed her.

Rickard's remaining contentions rely on his argument that the court's finding that he was a direct aider and abettor because he supplied the weapon would be an insufficient basis for denying his petition.   While we disagree with this argument, we decline to address the specifics because, as we have detailed *ante*, there is substantial evidence to support the court's finding that Rickard was a direct aider and abettor both by providing the knife and by holding down Amanda.

DISPOSITION

The order is affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


IRION, J.


DATO, J.

13